THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
ANTHONY PEYSER, On Behalf of Himself
And All Others Similarly Situated,                    Civil Action No. 08-Civ-9404 (RMB)

                        Plaintiff,

                                                      **CLASS ACTION COMPLAINT**
            vs.                                       <u>ECF Case</u>

RICHARD S. FULD, JR., MICHAEL L.
AINSLIE, JOHN F. AKERS, ROGER S.
BERLIND, THOMAS H. CRUIKSHANK,
MARSHA JOHNSON EVANS, SIR                             <u>**JURY TRIAL DEMANDED**</u>
CHRISTOPHER GENT, ROLAND A.
HERNANDEZ, HENRY KAUFMAN, JOHN D.
MACOMBER and UBS FINANCIAL SERVICES, INC.,

                        Defendants.
-----------------------------------------------------------------


      Plaintiff, individually and on behalf of all other persons similarly situated (the "Class"),

by Plaintiff's undersigned attorneys, makes the following allegations on information and belief

based upon the investigation of counsel, except as to the allegations pertaining specifically to

Plaintiff and Plaintiff's counsel which are based on personal knowledge. The investigation

conducted by Plaintiff's counsel included, *inter alia*, a review and analysis of (i) publicly

available news articles and reports; (ii) public filings including, but not limited to, Lehman

Brothers Holdings Inc.'s ("Lehman" or the "Company") filings with the Securities and Exchange

Commission ("SEC");  and (iii) press releases issued by defendants.  Plaintiff believes that

additional substantial evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## NATURE OF ACTION

1.    This is a securities class action filed on behalf of purchasers of certain Senior unsecured

obligations of Lehman Brothers known as the Return Optimization Securities with Partial

Protection Linked to the S&P 500® Index (the "Notes) from March 28, 2008, the date of the

Pricing Supplement No. 1 to the Lehman Brothers Registration Statement describing the Notes

(the "Offering or "Prospectus), and all purchasers traceable thereto until September 15, 2008 (the

day Lehman declared bankruptcy (the "Class Period ).  These claims are brought against certain

officers and directors of Lehman as the issuer and UBS Financial Services Inc. as an underwriter

of the Offering (collectively, "Defendants") for violations of the federal securities laws in

connection with the Offering.

2.    This action arises under Sections 11 and 15 of the Securities Act of 1933 (the "Securities

Act"), 15 U.S.C. §§ 77k, 77l and 77o which imposes liability on a company's directors and

officers, among others, for failure to disseminate a Prospectus and related documents that fully

and accurately disclosed to investors all material facts and industry trends affecting the issuer

company.

3.    The Prospectus contained both materially inaccurate statements and omissions, which

Plaintiff and the Class relied upon to their detriment. The statements and representations made in

the Company's Prospectus were materially inaccurate because at the time of the Offering,

Lehman was already suffering from severe adverse factors that were not adequately disclosed in

the Prospectus or any public filings incorporated therein by reference. These factors include, but

are not limited to, (i) the failure to disclose Lehman' s continued and aggressive marketing of

risky products linked to sub-prime mortgages in the face of the housing bubble collapse; (ii) the

failure to set aside adequate allowances to cover the Company's ever increasing portfolio of

2

underperforming sup-prime related products ; (iii) the continued marketing of highly risky

mortgage bonds and CDO' s backed by deteriorating assets even as the market for such

investment vehicles dried up; (iv) the promotion of unsustainable business practices designed to

exploit the mortgage lending business despite the inherent and actual risks involved; (v) its

insufficient capital levels; (vi) the failure to adequately write-down commercial and residential

mortgage and real estate assets;  (vii) the failure to have adequate monitoring policies and

controls in place, and/or the failure to adhere to risk policies that were in place;  (viii) the failure

to identify emerging risks and the failure to fully disclose such risks to the public; (ix) the failure

to prevent and remedy such improper and harmful actions that resulted in the Company being

forced into bankruptcy; and (x) the continued practice of paying entirely undeserved and

outsized bonuses. These factors were already causing a material adverse affect on Lehman's

business and directly led to Lehman's September 15, 2008 announcement that it was seeking

protection under the Federal Bankruptcy Code in the largest bankruptcy filing in U.S. history.

4.      The Defendants could have - and should have - discovered the materially inaccurate

statements and omissions in the Company's Prospectus prior to its filing with the SEC and

distribution to the investing public. Instead, they failed to do so as a result of a negligent and

grossly inadequate due diligence investigation.

5.      On September 15, 2008, Lehman filed a voluntary petition to reorganize under Chapter

11 of the Federal Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of

New York in the largest bankruptcy filing in history and largely wiped out the investment

interests of the Class.   The actions of Lehman and its officers and directors in the days and

weeks leading up to its bankruptcy attracted the scrutiny of law enforcement.  Presently, there

are a number of investigations concerning Lehman's conduct leading up to its bankruptcy filing.

3

On October 18, 2008, *The New York Times* reported that prosecutors stepped up the investigation into the collapse of Lehman Brothers, with at least a dozen subpoenas being issued including one to the investment bank's chief executive, Richard Fuld. The *Times* said federal prosecutors in Brooklyn, Manhattan and New Jersey were examining events leading to Lehman's collapse and bankruptcy filing and New Jersey prosecutors were looking into whether Lehman executives including Fuld, misled investors involved in the $6 billion infusion of capital announced by Lehman in June about the bank's condition. That infusion came as Lehman disclosed a $2.8 billion third-quarter loss, which caused its shares to plunge. The *Times* also reported that Brooklyn and Manhattan prosecutors are looking into remarks made by Lehman executives during a September 10 conference call, which was five days before the company's bankruptcy filing, and are also investigating whether Lehman assigned proper values on its large commercial real estate holdings.

6.    Plaintiff and the Class suffered serious financial damage as a result of Defendants' materially inaccurate statements and omissions in the Company's Prospectus, and bring this action to recover damages incurred thereby as well as the costs and expenses of this litigation and any further relief as may be just and proper.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

9.    Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b), because many of the alleged acts, transactions, and

4

conduct constituting violations of law, including the issuance and dissemination of materially false and misleading information to the investing public, occurred, at least in part, in this District. Additionally, Defendants reside, maintained their headquarters or conducted substantial business in this District.

10.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiff Anthony Peyser purchased the Notes issued pursuant to the Offering as set forth on the attached Certification, and was damaged thereby.

12.     During the Class Period, non-party Lehman was a Delaware corporation with its principal executive offices located in New York, New York. Lehman was an investment banking firm which, through its subsidiaries, provided various financial services to corporations, governments and municipalities, institutions, and high-net-worth individuals worldwide. The Company's activities included raising capital for clients through securities underwriting and direct placements, corporate finance, merchant banking, securities sales and trading, research services and private client services. On September 15, 2008, Lehman filed a voluntary petition to reorganize under Chapter 11 of the Federal Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York in what was the largest bankruptcy filing in history. As a result of its bankruptcy filing, Lehman has not been named as a defendant in this Complaint.

13.     Defendant UBS Financial Services, Inc. ("UBS") is incorporated in Delaware and its principal executive offices are located in New York, New York. UBS Financial Services, a

5

wholly-owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer and investment adviser and offers investment advisory and brokerage services to UBS clients. UBS was an underwriter of the Lehman Offering and is referred to herein as the Underwriter Defendant.

14.     During the Class Period, defendant Richard S. Fuld, Jr. ("Fuld") was Chairman of the Board of Directors of Lehman Brothers Holdings Inc. and Lehman Brothers Inc. since 1994 and chief executive officer of the Company since 1993. He was Chairman of Lehman Brothers' Executive Committee. He was President and Chief operating Officer of Lehman Brothers Holdings Inc. and Lehman Brothers Inc. from 1993 to 1994, President and Co-Chief Executive officer of the Lehman Brothers Division of Shearson Lehman Brothers Inc. from 1990 to 1993, Vice Chairman of Shearson Lehman Brothers from 1984 until 1990, and was a Director of Lehman Brothers Inc. since 1984. He joined Lehman Brothers in 1969. Defendant Fuld signed the June 5, 2006 Registration Statement for the Lehman Offering.

15.     During the Class Period, defendant Michael L. Ainslie ("Ainslie") was a Director of Lehman Brothers Holdings Inc. since 1996, and served as a member of the Audit Committee. He was a Director of Lehman Brothers Bank, FSB. Defendant Ainslie signed the June 5, 2006 Registration Statement for the Lehman Offering.

16.     During the Class Period, defendant John F. Akers ("Akers") was a Director of Lehman Brothers Holdings Inc. since 1996. He served as the Chairman of the Compensation and Benefits Committee and as a member of the Finance and Risk Committee. Defendant Akers signed the June 5, 2006 Registration Statement for the Lehman Offering.

17.     During the Class Period, defendant Roger S. Berlind ("Berlind") was a Director of Lehman Brothers Holdings Inc. since 1985. He served as a member of the Audit Committee and

the Finance and Risk Committee. Defendant Berlind signed the June 5, 2006 Registration

Statement for the Lehman Offering.

18.     During the Class Period, defendant Thomas H. Cruikshank ("Cruikshank") was a

Director of Lehman Brothers Holdings Inc. since 1996 and served as the Chairman of the Audit

Committee and as a member of the Nominating and Corporate Governance Committee. He was

also a director of Lehman Brothers Inc. Defendant Cruikshank signed the June 5, 2006

Registration Statement for the Lehman Offering.

19.     During the Class Period, defendant Marsha Johnson Evans ("Evans") was a Director of

Lehman Brothers Holdings Inc. since 2004. She served as the chair of the Nominating and

Corporate Governance Committee and as a member of the Compensation and Benefits

Committee and the Finance and Risk Committee. Defendant Evans signed the June 5, 2006

Registration Statement for the Lehman Offering.

20.     During the Class Period, defendant Sir Christopher Gent ("Gent") was a Director of

Lehman Brothers Holdings Inc. since 2003.  He served as a member of the Audit Committee and

the Compensation and Benefits Committee. Defendant Gent signed the June 5, 2006 Registration

Statement for the Lehman Offering.

21.     During the Class Period, defendant Roland A. Hernandez ("Hernandez") was a Director

of Lehman Brothers Holdings Inc. since 2005. He served as a member of the Finance and Risk

Committee. Defendant Hernandez signed the June 5, 2006 Registration Statement for the

Lehman Offering.

22.     During the Class Period, defendant Henry Kaufman ("Kaufman") was a Director of

Lehman Brothers Holdings Inc. since 1995. He served as the Chairman of the Finance and Risk

Committee. Defendant Kaufman signed the June 5, 2006 Registration Statement for the Lehman Offering.

23.     During the Class Period, defendant John D. Macomber ("Macomber") was a Director of Lehman Brothers Holdings Inc. since 1994. He served as a member of the Compensation and Benefits Committee, the Executive Committee, and the Nominating and Corporate Governance Committee. Defendant Macomber signed the June 5, 2006 Registration Statement for the Lehman Offering.

24.     Defendants Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber are collectively referred to hereinafter as the "Director Defendants."

25.     Each of the individuals named in paragraphs 14-24 together with the Underwriter Defendant) participated in the drafting, preparation, or approval of various materially inaccurate statements contained in the Registration Statement/Prospectus in connection with the Offering, as complained of herein. Each of the defendants was responsible for ensuring the truth and accuracy of the statements contained in the Registration Statement/Prospectus in connection with the Offering.

26.     Each of the defendants, owed to purchasers of the Notes, including Plaintiff and the Class (as more fully defined below) the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement/Prospectus at the time it became effective. This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the Registration Statement/Prospectus not inaccurate. As herein alleged, each of the defendants violated these specific duties and obligations thereby causing damages to Plaintiff and the class.

8

## FACTUAL ALLEGATIONS

27.     On May 30, 2006, Lehman filed a registration statement (the "Base Registration Statement") with the SEC, covering an indeterminate amount of Securities, that "may be reoffered and resold on an ongoing basis after their initial sale in market-making transactions by affiliates of the registrant." That same day, Lehman filed its MTN (Medium Term Note) Series I Prospectus supplement (the "MTN Registration Statement") to the Base Registration statement in which Lehman described the terms that would generally apply to medium-term notes that Lehman intended to sell from time to time.

28.     Subsequent to the filing of the Base Registration Statement, from time to time, Lehman filed various product and pricing supplement registrations pursuant to which Lehman would announce  and describe the terms of  new product offerings.  For example, on or about January 28, 2008, Lehman filed its prospectus supplement no. 100 ("Supplement No. 100") to the Base Registration Statement announcing that Lehman may offer and sell notes linked to an index and which supplement described the S&P Index.  On or about March 26, 2008, Lehman filed a product supplement no. 820-I (the "Product Supplement") to the Base Registration Statement which described the terms that generally applied to the Notes and which also supplemented the terms of the Base Registration Statement.  Thereafter on March 28, 2008, Lehman filed a pricing supplement (the "Pricing Supplement") that set forth the final terms for the Notes which were to be sold in the aggregate amount of $29,567.250.00 and have a maturity date of September 30, 2009.  Pursuant to the Pricing Supplement, UBS Financial Services, Inc., and Lehman Brothers, Inc. as agents of Lehman purchased and resold the Notes to the public including Plaintiff who purchased  his Notes on March 31, 2008.

29.     Supplement No. 100, the Product Supplement and the Pricing Supplement together with the Base Registration Statement and the MTN Registration Statement are all considered part of Lehman's Registration Statement/Prospectus. The Prospectus contained materially inaccurate statements and failed to disclose any of the adverse information as set forth herein and therefore investors had no inkling that Lehman's financial position together with its lack of adequate risk controls were inexorably driving Lehman into bankruptcy.

30.     The profits that Defendants obtained in connection with the Offering were unlawful because Defendants violated Section 11 of the Securities Act. Under Section 11, the Director Defendants, among others, are liable in negligence for failure to file a Prospectus and related documents which fully and accurately informed investors of all material facts and industry trends affecting the issuer company.

31.     Lehman's Prospectus was materially inaccurate because it failed to reveal Lehman's significant exposure to the subprime market as the largest underwriter of U. S. mortgage bonds. The Prospectus also failed to disclose that as a result of the deteriorating market conditions and rapidly declining asset values and its vast amount of leverage, Lehman was in desperate need for capital and at substantial risk of failing as a going-concern.

32.     Further, the Prospectus made materially inaccurate statements regarding the risks associated with investing in the Company. Markedly missing from the disclosures in the "Risk Factors" section of the Prospectus was any reference to the fact that the weakening credit and mortgage markets could result in the potential that Lehman had overvalued by billions of dollars its asset positions and the effect that would have on Lehman's credit rating. Had Defendants conducted a proper and adequate due diligence investigation, however, they would have realized

Lehman's rapidly worsening financial position was the result of the softening mortgage market and weakening credit market.

33.    Lehman's Prospectus also incorporated by reference Lehman's quarterly and annual filings with the SEC.  On or about January 29, 2008,  Lehman filed the Company's annual report on Form 10-K (the Form 10-K) for the fiscal year ended November 30, 2007 which contained materially inaccurate statements concerning the adequacy of Lehman's risk control processes. The 10-K, which was signed by the Director Defendants, provided at page 70  a discussion of Risk Management:

> The Company's goal is to realize returns from business commensurate with the risks assumed.  The Company's business activities have inherent risks that the Company monitors, evaluates and manages through a comprehensive risk management structure.  These risks include market, credit, liquidity, operational and reputational exposures, among others.
>
> The bases of risk control processes are:
>
> - The Company establishes policies to document risk principles, risk capacity and tolerance levels.
> - The Company monitors and enforces adherence to risk policies.
> - The Company measures quantifiable risks using methodologies and models based on tested assumptions.
> - The Company identifies emerging risks through monitoring portfolios, new business development, unusual or complex transactions and external events and market influences.
> - The Company reports risks to stakeholder.
>
> Risk Management Structure
>
> While risk cannot be completely eliminated, the Company has designed an internal control environment to put appropriate risk mitigants in place.  Control processes separate the duties of risk management from revenue generation and effect management oversight of the risk management function.

34.     The foregoing statements were materially inaccurate for reasons including the Company's failure to: (i) identify emerging risks; (ii) report them to the stakeholders; and (iii) put appropriate risk mitigants in place.

35.     At the time of the Offering, Lehman was aware of the potentially dire consequences associated with (i) the inflated value it carried on its commercial and residential mortgage and real estate assets; and (ii) the lethal amount of leverage it carried.  Further, Lehman knew that it was taking woefully insufficient steps to lower its exposure to the weakening credit and mortgage markets, or taking steps to de-leverage, and it failed to disclose any of the associated risks to the public. The market volatility was adversely and materially harming Lehman's business as a result of its aggressive pursuit of the mortgage backed underwriting business and would inevitably adversely affect the Company's business on a going-forward basis.

36.     The Form 10-K also contained boilerplate language noting the existence of liquidity risk and the possibility that Lehman's liquidity might be "impaired" under certain circumstances.  See e.g., 10-K Report, 17, 38. Nothing in the Form10-K, however, remotely suggested the possibility that Lehman could seek bankruptcy protection from its creditors.  To the contrary, after noting that a "significant contraction in available liquidity" had developed in the latter half of 2007, the Report assured its readers that "[n]otwithstanding these global market conditions, we ended the period with a very strong liquidity position." Id. at 57.  Elsewhere, the Form 10-K further elaborated these materially inaccurate assurances, stating that "[w]e maintain a liquidity pool available to Holdings that covers expected cash outflows for twelve months in a stressed liquidity environment."  Id. Moreover, "[t]o mitigate the effect of a market liquidity event, we have developed access to additional liquidity sources beyond the liquidity pool at Holdings, including unutilized funding capacity in our bank entities and unutilized capacity in our bank

12

facilities. ... We perform regular assessments of our funding requirements in stress liquidity scenarios to best ensure we can meet all our funding obligations in all market environments." Id. at 61. The 10-K Report thus repeatedly and affirmatively made materially inaccurate statements about the true level of risk that Lehman faced as its creditworthiness deteriorated.

37.    In early April 2008, almost immediately following the Offering and Plaintiff's purchase therein, the Company was forced to raise $4 billion via the issuance of stock to improve its liquidity and calm market speculators.

38.    While the Company's prospects temporarily appeared to improve, its subprime exposure led to more problems. On June 3, 2008, Bloomberg News published an article entitled "Lehman Loses up to $700 million on Hedging Positions, FT Says." The article noted that the Company lost $500 million to $700 million in the second quarter which "may prompt the bank to seek more capital by selling a stake to an outside investor."

39.    On June 9, 2008, the Company issued a press release announcing that it had priced a $4 billion public offering of 143 million shares of common stock at $28 per share.  The Company also issued a press release announcing its financial results for the second quarter ended May 31, 2008. The Company reported a net loss of $2.8 billion. The press release went on to state: Capital Markets is expected to report net revenues of negative ($2.4) billion in the second quarter of fiscal 2008, compared to $1.7 billion in the first quarter of fiscal 2008 and $3.6 billion in the second quarter of fiscal 2007. Fixed Income Capital Markets is expected to report net revenues of negative ($3.0) billion, compared to $0.3 billion in the first quarter of 2008 and $1.9 billion in the second quarter of 2007.

40.    Slowly the magnitude of Lehman's problems began to emerge as more details about the

$2.8 billion loss became available.   Lehman said that it would attempt to raise an additional $6

billion in fresh capital through the issuance of stock to try and stop the bleeding.

41.    On Monday, June 16, 2008, Lehman released its actual numbers for the Second Quarter

of 2008, which matched the $2.8 billion or $5.14 per share number announced a week prior.

However, additional details provided investors and analysts with more insight into the reasons

behind the loss. As it turns out, most of the loss was due to about $3.7 billion in write downs due

to bad loans.

42.    On September 10, 2008, the Company issued a press release announcing preliminary

results for the third quarter ended August 31, 2008. The Company reported a net loss of $3.9

billion and announced "a comprehensive plan of initiatives to reduce dramatically the firm's

commercial real estate and residential mortgage exposure, generate additional capital through the

sale of a majority stake of the Investment Management Division and reduce the annual dividend,

in order to maximize value for clients, shareholders and employees." The press release stated in

pertinent part:

### OVERVIEW OF PRELIMINARY THIRD QUARTER RESULTS

Lehman Brothers reported a preliminary net loss of approximately ($3.9) billion,
or ($5.92) per common share (diluted), for the third quarter ended August 31,
2008, compared to a net loss of ($2.8) billion, or ($5.14) per common share
(diluted), for the second quarter of fiscal 2008 and net income of $ 887 million, or
$1.54 per common share (diluted), for the third quarter of fiscal 2007. The net
loss was driven primarily by gross mark-to-market adjustments stemming from
writedowns on commercial and residential mortgage and real estate assets.

Net revenues (total revenues less interest expense) for the third quarter of fiscal
2008 are expected to be negative ($2.9) billion, compared to negative ($ 0.7)
billion for the second quarter of fiscal 2008 and $4.3 billion for the third quarter
of fiscal 2007. Net revenues for the third quarter of fiscal 2008 reflect negative
mark-to- market adjustments and principal trading losses, net of gains on certain
risk mitigation strategies and certain debt liabilities. During the fiscal third

14

quarter, the Firm is expected to incur negative gross mark-to-market adjustments on assets of ($7.8) billion, including gross negative mark-to-market adjustments of ($5.3) billion on residential mortgage-related positions, ($1.7) billion on commercial real estate positions, ($600) million on other asset-backed positions and ($200) million on acquisition finance positions. These mark-to-market adjustments were offset by $800 million of hedging gains during the quarter and $1.4 billion of debt valuation gains. The Firm is also expected to record losses on principal investments of approximately $760 million.

In order to increase operating efficiency, the Firm has eliminated approximately 1,500 positions since the beginning of the third quarter in discretionary corporate areas and businesses that are in secular decline. [Emphasis added].

43.    Less than a week later, on September 15, 2008, Lehman filed a voluntary petition to reorganize under Chapter 11 of the Federal Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York in the largest bankruptcy filing in history rendering the Notes substantially less valuable.

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action individually and on behalf of a Class of purchasers of the Notes issued pursuant and/or traceable to the Company's Prospectus from March 28, 2008, the date of the Pricing Supplement No. 1 to the Lehman Brothers Registration Statement (the "Offering or "Prospectus), and all purchasers traceable thereto until September 15, 2008 (the day Lehman declared bankruptcy).  Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in interest or assigns of any such excluded.

45.    The members of the Class are so numerous that joinder of all members impracticable. Approximately $29.5 million of the Notes with a maturity date of September 20, 2009 were sold in the Offering.  The precise number of Class members is unknown to Plaintiff at this time but is

15

believed to be at least in the hundreds. In addition, the names and addresses of the Class members can be ascertained from the books and records of Lehman or its transfer agent or the underwriters for the Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

46.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and to prosecute this action vigorously.

47.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all of the Class members' damages arise from and were caused by the same materially inaccurate representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

48.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)      Whether documents, including the Prospectus issued by Defendants to the investing public contained materially inaccurate statements and omitted material facts about Lehman and its business and business practices; and

(c)      The extent of injuries sustained by the Class and the appropriate measure of damages.

## FIRST CLAIM FOR RELIEF

### Violations of Section 11 of The Securities Act Against All Defendants

50.      Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k. This claim is not based on fraud.

51.      This claim is brought by Plaintiff and on behalf of other members of the Class who purchased or acquired the Notes pursuant to the Registration Statement and Prospectus.  Each Class member purchased or acquired their Notes pursuant to the Registration Statement and Prospectus. Lehman is the issuer of the Notes through the Registration Statement and Prospectus. The Director Defendants are signatories of the Registration Statement.  UBS acted as an underwriter and co-manager of the Offering.

52.      Defendants owed to Plaintiff and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, including the various product and pricing supplements and the 2007 Form 10-K,  at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

17

53.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not inaccurate.

54.    Defendants issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of statements to the investing public contained in the Prospectus, which were materially inaccurate and/or which failed to disclose, inter alia, the facts set forth above. By reason of the conduct alleged herein, each defendant violated Section 11 of the Securities Act.

55.    Director Defendants, as signatories of the issuer of the Notes sold in the Prospectus, are liable to Plaintiff and the Class for the materially inaccurate statements and omissions discussed above.

56.    The Underwriter Defendant was an underwriter of the  Notes as that term is used in Section 11(a)(5) of the Securities Act.

57.    Plaintiff and the Class purchased their Notes without knowledge of the facts concerning the materially inaccurate statements and/or omissions alleged herein.

58.    This action is brought within one year after discovery of the materially inaccurate statements and omissions in the Prospectus, and within three years of the effective date of the Prospectus.

59.    By virtue of the foregoing, Plaintiff and the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants and each of them, jointly and severally.

## SECOND CLAIM FOR RELIEF

### Violations of Section 15 of The Securities Act Against Director Defendants

60.    Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

61.    This claim for relief is brought by Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class against the Director Defendants.

62.    Each of the Director Defendants was a control person of Lehman with respect to the Offering by virtue of their positions as senior executive officers and/or directors of Lehman.

63.    As a result, the Director Defendants are liable under Section 15 of the Securities Act for Lehman's primary violations of Section 11 of the Securities Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a)    declaring this action to be a Class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class, and certifying their counsel as Class Counsel;

(b)    awarding Plaintiff and other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(d)    awarding Plaintiff and the Class such other and further relief as may be just and proper under the circumstances.

19

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 31, 2008

**LAW OFFICES OF JAMES V. BASHIAN, P.C.**

BY: _____

JAMES V. BASHIAN (JB-6331)
500 Fifth Avenue, Suite 2700
New York, New York 10110
Tel. (212) 921-4110
Fax. (212) 921-4249

**LOVELL STEWART HALEBIAN LLP**

BY: _____

JOHN HALEBIAN (JH-8005)
500 Fifth Avenue
New York, New York 10110
Tel. (212) 981-6760
Fax. (212) 208-6806

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, ANTHONY PEYSER ("Plaintiff") certify::

1.      I have reviewed the complaint and authorized its filing on behalf of Plaintiff. Plaintiff retains James V. Bashian of the Law Offices of James V. Bashian, P.C. and John Halebian of Lovell Stewart & Halebian, LLP to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase or acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary. Plaintiff understands that if the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this certification

4.      The following constitute Plaintiff's transactions in the security that is the subject of this litigation during the class period set forth in the complaint:

## TRANSACTIONS

| BUY | SELL | DATE | Price P/S |
|-----|------|------|-----------|
| 2500 SHARES | | 3/31/08 | 10.00 |

21

5.      Plaintiff has not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated:  New York, New York
        October 30 , 2008

_____
ANTHONY DEYSER

22